942 So.2d 1001 (2006)
DE LAGE LANDEN FINANCIAL SERVICES, INC., Appellant,
v.
CRICKET'S TERMITE CONTROL INC., etc., et al., Appellee.
Nos. 5D06-863, 5D06-1147.
District Court of Appeal of Florida, Fifth District.
December 1, 2006.
*1002 Tracye K. Solove and Robert A. Solove, of Solove & Solove, P.A., Miami, for Appellant.
Garry D. Adel, of Blanchard, Merriam, Adel & Kirkland, P.A., Ocala, for Appellee.
ORFINGER, J.
De Lage Landen Financial Services, Inc. ("DLL") appeals an adverse final judgment in its breach of lease claim against Cricket's Termite Control, Inc. d/b/a Cricket's Pest Control and Donald L. McKamey (collectively, "Cricket's"). The trial court refused to enforce the lease, finding it to be illegal. Because we find the lease is legally enforceable, we reverse the final judgment. As a result, the attorney's fee award in favor of Cricket's is also reversed.
In November 2000, Cricket's entered into a written agreement with U.S. Bancorp to lease a Pro Lead PMC Computer Marketing System ("the System"). Mr. McKamey, Cricket's President, personally guaranteed performance of the lease. U.S. Bancorp subsequently assigned its rights under the lease to DLL. The System is essentially a computer and a program that randomly selects and dials the telephone numbers of potential customers and plays a pre-recorded message when a phone is answered. Cricket's intended to use the System to offer its pest control services to people who were not existing customers.
In January 2003, Cricket's received a notice from the Florida Department of Agriculture & Consumer Services ("the *1003 Department") concerning violations of Florida's No Sales Solicitation Law, section 501.059, Florida Statutes (2003). The notice stated that the Department had received complaints that Cricket's had been making telephonic sales calls in violation of section 501.059, which prohibits calls involving "an automated system for the selection or dialing of telephone numbers or the playing of a recorded message when a connection is completed to a number called." § 501.059(7)(a), Fla. Stat. (2003). The notice ordered Cricket's to stop such telephone calls immediately, and informed it that calls made in violation of section 501.059 would subject Cricket's to injunctive relief, including civil penalties of up to $10,000 per call. Upon receipt of this letter, Cricket's immediately stopped using the System and quit making lease payments to DLL.
DLL then filed a suit against Cricket's and Mr. McKamey. In its complaint, DLL alleged that Cricket's defaulted on its contract, and, as a result, owed DLL damages, court costs, interest, and reasonable attorney's fees. Cricket's sole defense was premised on its assertion that the lease was illegal in light of section 501.059 and was, therefore, unenforceable.
A non-jury trial was held before the court. During the trial, Mr. McKamey testified that PMC, the manufacturer, solicited him to purchase the System. During his initial conversation with PMC, Mr. McKamey did not ask about the legality of using the System in Florida. However, Mr. McKamey testified that at a later date, PMC told him that it had checked with its lawyers, and that the System was "perfectly legal." PMC gave Mr. McKamey some references, which he contacted to ensure the System's legality. U.S. Bancorp, the original lessor, also informed Mr. McKamey that PMC had other clients in Florida who were happy with the System, which "led [him] to believe that it's legal." Mr. McKamey explained that the System arrived with a message that had been pre-recorded by PMC. According to Mr. McKamey, he could not change the System to accommodate live messages. When Mr. McKamey turned the System on, it dialed numbers by zip code and then played the pre-recorded message when a connection was made to the number called. Mr. McKamey believed that as long as he did not dial any of the numbers on the "do not call" list, he would be in compliance with Florida law. After he received the notice from the Department notifying him that the System was illegal as it was being used, Mr. McKamey promptly shut down the machine and attempted to contact PMC, only to discover that it had gone out of business.
The trial court entered judgment in favor of Cricket's and subsequently granted Cricket's motion for attorney's fees. Although the trial court made no findings of fact or conclusions of law in its judgment, Cricket's only defense was the alleged illegality of the lease. In this consolidated appeal, DLL seeks review of both the final judgment and the judgment on attorney's fees.
The issue we consider is whether the lease agreement is an enforceable contract, or if it is void for violating the Florida Statutes or Florida public policy. Generally, "[a] contract which violates a provision of the constitution or a statute is void and illegal and, will not be enforced in our courts." Harris v. Gonzalez, 789 So.2d 405, 409 (Fla. 4th DCA 2001). Cricket's argues, and the trial court agreed, that the parties' lease agreement was void and unenforceable because its use of the System violated section 501.059's prohibition of automated telephone solicitation.[1] *1004 We disagree.
A contract is not void merely because a party used the contracted-for item illegally. "If an agreement is capable of being performed in a legal manner, the mere fact that one of the parties to the agreement intended to perform it in an illegal manner will not preclude its enforcement." 17A Am.Jur.2d Contracts § 225 (2006); see also 17A Am.Jur.2d Contracts § 228 (2006) (stating that "where a contract could have been performed in a legal manner as well as in an illegal manner, it will not be declared void because it was in fact performed in an illegal manner, at least if the performance is not seriously injurious to the public order[;] . . . [n]or will a contract be declared void because it might have been performed in an illegal manner, since bad motives are never to be imputed to any person where fair and honest intentions are sufficient to account for his or her conduct").
While no Florida courts have addressed these specific facts, the Arkansas Supreme Court dealt with the same issue on nearly identical facts in Potomac Leasing Co. v. Vitality Centers, Inc., 290 Ark. 265, 718 S.W.2d 928 (1986). In that case, Vitality Centers entered into an agreement with Potomac, to lease an automated telephone system that was manufactured by a company who was not a party to the action. After making a few payments on the lease, Vitality returned the system to Potomac and ceased payment. Potomac sued Vitality to enforce the lease. Vitality, who had planned to use the system to randomly dial phone numbers and play a recorded message advertising its products, claimed that the contract was void because its intended use was illegal in Arkansas, and, therefore, the subject matter of the lease was also illegal. The trial court agreed with Vitality, but the supreme court overruled that decision. Id. at 928-29.
*1005 The Arkansas Supreme Court held that the fact "[t]hat the subject matter of a contract is to be used for an illegal purpose, does not in itself make a contract for the sale of that product void." Potomac, 718 S.W.2d at 929. In support of its holding, the court cited to 6A Arthur L. Corbin, Corbin on Contracts, § 1519 (1962), which elaborates:
If the terms of a contract and its actual performance are all in themselves lawful, it is not made unlawful by the fact that the subject matter is capable of being put to illegal uses. Fire arms, a house, a motor car, liquors, a fountain pen can all be used for tortious or criminal purposes; but a contract for their sale is not for that reason invalid. Such a bargain is not enforceable by the buyer, however, if he buys with the purpose of making an illegal use of the subject matter. A seller who, with knowledge of the buyer's illegal purpose, makes the sale and delivers the subject matter, thereby increases the probability that the illegal purpose will be carried out, even though he does not participate in the purpose, urges its abandonment, and hopes for the best. This fact makes the bargain unenforceable by the seller also, if the illegal purpose of which he has knowledge involves the commission of a serious crime or an act of great moral turpitude. In cases other than these, the seller's knowledge of the purpose does not prevent his enforcement of the bargain, if he in no way participates in the purpose and does not act in furtherance of it aside from making the sale.
Potomac, 718 S.W.2d at 929-30.
In holding that the lease was not void, the Potomac court observed that Arkansas law allows some uses of automated telephone dialing machines, the automated system in question could perform legal functions, and Potomac did not know of or act in furtherance of Vitality's intended use. Id. at 930. At trial, Cricket's tried to show that there was no legal use for the System because it could only play pre-recorded messages. Seemingly, Cricket's was focusing on the exception found in section 501.059(7)(b), which allows telephone dialing machines to be used with live messages. While it is unclear whether the System would work with live messages, there are other legal uses of the System. Section 501.059, the section that Cricket's is accused of violating, governs telephone solicitation, and only applies to a "telephonic sales call," which is defined as:
[A] call made by a telephone solicitor to a consumer, for the purpose of soliciting a sale of any consumer goods or services, or for the purpose of soliciting an extension of credit for consumer goods or services, or for the purpose of obtaining information that will or may be used for the direct solicitation of a sale of consumer goods or services or an extension of credit for such purposes.
§ 501.059(1)(a), Fla. Stat. (2003). This definition does not prohibit the use of automated telephone systems for non-solicitation purposes, including for charitable, religious, political, or other purposes. In fact, Oregon law provides a specific exception that allows the use of automated dialing devices for the solicitation of funds by charitable or political organizations or institutions.[2]See Or.Rev.Stat. § 759.290(2)(a) (2003). Thus, even if the System is incapable of being used with live *1006 messages, it could have been used in a legal manner.[3]
Other principles also support reversal. The lease at issue is a "finance lease," as that term is defined in the Uniform Commercial Code. See § 680.1031(1)(g), Fla. Stat. (2003); see also Or.Rev.Stat. § 72A.1030 (2003). A finance lease is a method to finance the acquisition of goods. A lender who enables a buyer to acquire the goods normally is not subject to a refusal by the buyer to repay the loan if the goods turn out to be other than the buyer expected. Similarly, a finance lessee cannot refuse to pay a lessor an agreed payment. 3 William D. Hawkland, Hawkland UCC Series, § 2A-209:01 (Frederick K. Miller, ed. 2006).
Further, both Florida and Oregon have extended the benefits of the classic "hell-or-high-water" clause[4] to finance leases pursuant to section 680.407, Florida Statutes, and section 72A.4070, Oregon Revised Statutes (2003). This provision of the Uniform Commercial Code makes covenants in a finance lease irrevocable and independent, due to the function of the finance lessor in a three-party relationship. Upon the lessee's acceptance of the goods, the lessee's promises to the lessor under the lease contract become irrevocable and independent. See § 680.407, Fla. Stat. (2003) (UCC Cmt. 1); Or.Rev.Stat. § 72A.4070 (2003) (UCC Cmt. (g)). But, if the goods are not as contemplated, what recourse does the finance lessee have? The lessee originally dealt with the supplier, who ultimately sold or leased the goods under the contract to the finance lessor rather than to the finance lessee. Hence, the supplier is the party that may be ultimately accountable, and the logical source of recourse for the finance lessee. 3 Hawkland, Hawkland UCC Series at § 2A-209:01.
Finally, this outcome is consistent with the disclaimers contained in paragraph 17 of the lease, which provides:
17. LESSOR'S DISCLAIMERS: Lessor has obtained the Property based on specifications furnished by the Lessee. Lessor does not deal in property of this kind or otherwise hold itself or its agents out as having knowledge or skill peculiar to the Property. Lessee acknowledges that it has relied on its own skill and experience in selecting property suitable to the Lessee's particular needs or purposes and has neither relied upon the skill or judgment of Lessor nor believes that Lessor or its agents possess any special skill or judgment in the selection of property for Lessee's particular purposes. Further, Lessee has not notified Lessor of Lessee's particular needs in using the Property. Lessee understands and agrees that neither the Supplier(s) nor any salesman or any agent of the Supplier(s) is an agent of *1007 Lessor. No salesman or agent of supplier is authorized to waive or alter any term or condition of this Lease, and no representation as to the Property or any other matter by the Supplier shall in any way affect Lessee's duty to pay the rent and perform its obligations as set forth in this Lease. Lessor shall not be liable to Lessee for any incidental, consequential, or indirect damages or for any act, neglect, omission, breach or default by any third party.
LESSOR ASSUMES NO RESPONSIBILITY FOR AND MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, AS TO THE DESIGN, COMPLIANCE WITH SPECIFICATIONS, CONDITION, QUALITY, WORKMANSHIP, OR THE SAFETY, SUITABILITY, ADEQUACY, OPERATION, USE OR PERFORMANCE OF THE PROPERTY OR AS TO ITS MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OR AS TO PATENT, TRADEMARK OR COPYRIGHT INFRINGEMENT. ANY DELAY IN DELIVERY SHALL NOT AFFECT THE VALIDITY OF THIS LEASE. LESSOR SHALL NOT BE LIABLE TO LESSEE FOR ANY REPRESENTATION, CLAIM, BREACH OF WARRANTY, EXPENSE OR LOSS DIRECTLY OR INDIRECTLY CAUSED BY ANY PERSON, INCLUDING LESSOR, OR IN ANY WAY RELATED TO THE PROPERTY.
For the foregoing reasons, we reverse the final judgment and remand this matter to the trial court with directions that judgment be entered in favor of DLL. We likewise reverse the attorney's fees judgment in favor of Cricket's, and, on remand, DLL shall be entitled to recover its reasonable attorney's fees and costs as the prevailing party.
REVERSED AND REMANDED.
PLEUS, C.J. and GRIFFIN, J., concur.
NOTES
[1] The lease agreement at issue provides that it "shall be considered to have been made in the state of Oregon and shall be interpreted, and the rights and liability of the parties determined, in accordance with applicable Federal Law and the Laws of the State of Oregon." Section 759.290, Oregon Revised Statutes (2003), provides:

(1) No person shall use an automatic dialing and announcing device to solicit the purchase of any realty, goods or services.
(2) Subsection (1) of this section does not apply to:
(a) The solicitation for funds by charitable or political organizations or institutions.
(b) Contacts between persons with an existing business relationship.
(3) As used in this section:
(a) "Automatic dialing and announcing device" means equipment that dials programmed telephone numbers and plays a recorded message when the call is answered.
(b) "Existing business relationship" means a preexisting and continuing course of dealing between parties involving the purchase or sale of realty, goods or services.
This section is consistent with section 501.059, Florida Statutes (2003), which Cricket's was accused of violating. Section 501.059 states:
(7)(a) No person shall make or knowingly allow a telephonic sales call to be made if such call involves an automated system for the selection or dialing of telephone numbers or the playing of a recorded message when a connection is completed to a number called.
(b) Nothing herein prohibits the use of an automated telephone dialing system with live messages if the calls are made or messages given solely in response to calls initiated by the persons to whom the automatic calls or live messages are directed or if the telephone numbers selected for automatic dialing have been screened to exclude any telephone subscriber who is included on the department's then-current "no sales solicitation calls" listing or any unlisted telephone number, or if the calls made concern goods or services that have been previously ordered or purchased.
[2] Although the Florida Statutes do not contain a similar blanket exception for specific types of organizations, the Florida Telemarketing Act does carve out an exemption for organizations "soliciting for religious, charitable, political, or educational purposes." § 501.604(2), Fla. Stat. (2003).
[3] The Potomac court noted one exception to the general rule that the fact that a contracted-for product can be used in an illegal manner does not in itself make the contract illegal. Such an agreement will be invalid when the seller knows the product will be used in "flagrant violation of the fundamental rights of man and society." 718 S.W.2d at 929. The record contains nothing showing that DLL or U.S. Bancorp knew of Cricket's planned use of the System. Even if U.S. Bancorp or DLL had known of Cricket's intentions, Cricket's use of the System was not a flagrant violation of the fundamental rights of man and society.
[4] See Black's Law Dictionary 729 (7th ed. 1999) (defining the "hell-or-high-water clause" as "[a] clause in a personal-property lease requiring the lessee to continue to make full rent payments to the lessor even if the thing leased is unsuitable, defective, or destroyed").